**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. **15-20772**

18 U.S.C. § 1349
18 U.S.C. § 371
18 U.S.C. § 982

CR-MORENO

/ O'SULLIVAN

**UNITED STATES OF AMERICA**

vs.

**HENRY LORA,**

Defendant.
_____/

**INDICTMENT**

The Grand Jury charges that:

**GENERAL ALLEGATIONS**

At all times material to this Indictment:

**The Medicare Program**

1.     The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were 65 or older or disabled.  Medicare was administered by the Centers for Medicare & Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").  Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320-7b(f).

3.      "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required home health services because of an illness or disability that caused them to be homebound.  Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4.      Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number."  A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and provider number of the physician or other health care provider who ordered the services.

5.      CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs.  CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States.  In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims.  As administrator, Palmetto was to receive, adjudicate, and pay claims submitted by HHA providers under the Part A program for home health claims.

## **Part A Coverage and Regulations**

## **Reimbursements**

6.      The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits.  A patient qualified for home health benefits only if:

    a.      the patient was confined to the home, also referred to as homebound;

    b.      the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

    c.      the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7.      HHAs were reimbursed under the Home Health Prospective Payment System ("PPS").  Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care."  The base payment was adjusted based on the health condition and care needs of the beneficiary.  This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition.  If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence.  There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

8.      In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered. At the end of a 60-day episode, when the final claim was submitted, the remaining portion of the payment would be made. As explained in more detail below, "Outlier Payments" were additional PPS payments based on visits in excess of the norm. Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

## Record Keeping Requirements

9.      Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10.     Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the

patient was confined to his or her home and was in need of the planned home health services, and an OASIS form.

11.     Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary.  The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any instruction provided to the patient and the understanding of the patient, and any changes in the patient's physical or emotional condition.  The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury.  These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

### Special Outlier Provision

12.     Medicare regulations allowed certified HHAs to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified HHA.  The certified HHA would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees.  However, Medicare regulations prohibit one HHA merely serving as a billing mechanism for another agency.

13.     For insulin-dependent diabetic beneficiaries, Medicare paid for insulin injections by an HHA when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary. Additionally, for beneficiaries for whom occupational or physical therapy was medically

necessary, Medicare paid for such therapy provided by an HHA.  The basic requirements that a physician certify that a beneficiary is confined to the home or homebound and in need of home health services, as certified by a physician, was a continuing requirement for Medicare to pay for such home health benefits.

14.     While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries who had the most extensive care needs, which may result in an Outlier Payment to the HHA.  These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

### The Defendant, Co-Conspirators, and Related Entities

15.  Defendant **HENRY LORA** was an owner and operator of Merfi Corp. ("Merfi"), a corporation organized under the laws of the State of Florida, which purportedly did business at 4800 SW 8th Street, Coral Gables, Florida, 33134 and at 42 N.W. 27th Avenue, Miami, Florida 33125.  **HENRY LORA** worked at Merfi as a physician.

16.  Isabel Medina was also an owner and operator of Merfi, and was listed in its corporate records as its president.

17.  Henry Lora, MD, PA was a corporation organized under the laws of the State of Florida, which purportedly did business at 4800 SW 8th Street, Coral Gables, Florida, 33134 and at 42 N.W. 27th Avenue, Miami, Florida 33125.  **HENRY LORA** was the original incorporator and president of Henry Lora, MD, PA.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.     Paragraphs 1 through 17 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     From in or around at least April of 2007, and continuing through in or around September of 2013, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**HENRY LORA,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with Isabel Medina, Estrella Perez, Antonio Suarez, Marlen Trujillo, and others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, Unites States Code, 1347; and

b.     to knowingly and with the intent to defraud devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals,

pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (1) providing fraudulent prescriptions for medically unnecessary home health care and other services in return for the payment of bribes and kickbacks; (2) submitting and causing the submission of false and fraudulent claims to Medicare; (3) concealing the submission of false and fraudulent claims to Medicare; (4) the receipt and transfer of the proceeds from the fraud, and the payment and receiving of kickbacks; and (5) diverting and causing the diversion of the fraud proceeds for the personal use and benefit of the defendant and his co-conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4.      **HENRY LORA** and Isabel Medina received kickbacks and bribes from patient recruiters, the owners and operators of home health care agencies, and other Medicare providers in exchange for providing fraudulent prescriptions for home health care and other services that were not medically necessary and not provided to Medicare beneficiaries.

5.      **HENRY LORA**, Isabel Medina, and their co-conspirators falsified patient documentation to make it appear that Medicare beneficiaries qualified for and received home health care and other services when, in fact, the services were not medically necessary and not provided.

6.      **HENRY LORA**, Isabel Medina, and their co-conspirators caused multiple Miami-Dade County home health agencies and other Medicare providers to submit false and fraudulent claims to Medicare, via interstate wire communications, seeking payment for home health care and other services purportedly provided to beneficiaries when, in fact, such services were not medically necessary and not provided.

7.      As a result of such false and fraudulent claims, **HENRY LORA**, Isabel Medina, and their co-conspirators caused Medicare to make payments to multiple Miami-Dade home health agencies and other Medicare providers.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
**Conspiracy to Defraud the United States, Receive Health Care Kickbacks, and Make False Statements Relating to Health Care Matters**
**(18 U.S.C. § 371)**

1.      Paragraphs 1 through 17 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      From in or around at least April of 2007, and continuing through in or around September of 2013, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**HENRY LORA,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with Isabel Medina, Estrella Perez, Antonio Suarez, Marlen Trujillo, and others, known and unknown to the Grand Jury:

a.      to commit certain offenses against the United States, that is, to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means,

the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program;

  b.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(B), by knowingly and willfully soliciting and receiving remuneration, including any kickback and bribe, directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, Medicare;

  c.      to knowingly and willfully falsify, conceal, and cover up by any trick, scheme, and device a material fact in connection with the delivery of and payment for health care benefits, items, and services involving a health care benefit program, that is, Medicare, in violation of Title 18, United States Code, Section 1035(a)(1); and

  d.      to knowingly and willfully make any materially false, fictitious, and fraudulent statements and representations, and knowingly and willfully make and use a materially false writing and document, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services involving a health care benefit program, that is, Medicare, in violation of Title 18, United States Code, Section 1035(a)(2).

## PURPOSE OF THE CONSPIRACY

  3.      It was the purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by:  (1) soliciting and receiving kickbacks and bribes in return for dispensing prescriptions for home health care and other services; (2) concealing the fact that the prescriptions they sold were for services that were not medically necessary and not actually

provided to Medicare beneficiaries; (3) causing false information to be written into medical records at Merfi and elsewhere to make it appear as though Medicare beneficiaries had a medical need and qualified for home health care or other services; and (4) causing the submission of claims to Medicare for home health care and other services that co-conspirators purported to provide to those beneficiaries.

<u>**MANNER AND MEANS OF THE CONSPIRACY**</u>

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.     **HENRY LORA**, Isabel Medina, and their co-conspirators solicited and received kickbacks from patient recruiters, owners of Miami-Dade home health care agencies and other Medicare providers, and others in return for prescriptions for home health care and other services.

5.     **HENRY LORA**, Isabel Medina, and their co-conspirators falsified patient records, in whole and in part, to make it appear as though Medicare beneficiaries qualified for and received home health care and other services that were, in fact, not medically necessary and not provided.

6.     **HENRY LORA**, Isabel Medina, and their co-conspirators caused multiple Miami-Dade County home health care agencies and other Medicare providers to submit claims to Medicare for home health care and other services purportedly rendered to the Medicare beneficiaries.

7.     **HENRY LORA**, Isabel Medina, and their co-conspirators caused Medicare to pay multiple Miami-Dade County home health care agencies and other Medicare providers for claims for home health care and other services purportedly provided to Medicare beneficiaries.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.      On or about October 19, 2010, **HENRY LORA** deposited check number 6397, which was written to Henry Lora, MD, PA in the approximate amount of $7,000 and drawn on the corporate account of Merfi.

2.      On or about December 3, 2010, **HENRY LORA** deposited check number 6517, which was written to Henry Lora, MD, PA in the approximate amount of $2,500 and drawn on the corporate account of Merfi.

3.      On or about December 27, 2010, **HENRY LORA** deposited check number 6579, which was written to Henry Lora, MD, PA in the approximate amount of $12,000 and drawn on the corporate account of Merfi.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE
### (18 U.S.C. § 982)

1.      The allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging criminal forfeiture to the United States of America of certain property in which the defendant, **HENRY LORA**, has an interest.

2.      Upon conviction of any violation alleged in this Indictment, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation.

3.     The property which is subject to forfeiture includes, but is not limited to, the following: A sum of money equal in value to the property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the violations alleged in this Indictment, which the United States of America will seek as a forfeiture money judgment against the defendant as part of his sentence.

All pursuant to Title 18, United States Code, Section 982(a)(7) and the procedures set forth in Title 21, United States Code, Section 853.

A TRUE BILL

_____

FOREPERSON

_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY

_____
GEJAA GOBENA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
A. BRENDAN STEWART
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

-13-

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

CASE NO. _____

vs.

**CERTIFICATE OF TRIAL ATTORNEY***

HENRY LORA,

Defendant.

_____/

**Superseding Case Information:**

Court Division: (Select One)

| | | | |
|---|---|---|---|
| __X__ Miami | | Key West | New Defendant(s) _____   No _____ |
| _____ FTL | _____ WPB | _____ FTP | Number of New Defendants _____ |
| | | | Total number of counts _____ |

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:    (Yes or No)    __No__
   List language and/or dialect    _____

4. This case will take  __10__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                                  (Check only one)

   | | | | | |
   |---|---|---|---|---|
   | I | 0 to 5 days | _____ | Petty | _____ |
   | II | 6 to 10 days | __X__ | Minor | _____ |
   | II | 11 to 20 days | _____ | Misdem. | _____ |
   | IV | 21 to 60 days | _____ | Felony | __X__ |
   | V: | 61 days and over | _____ | | |

6. Has this case been previously filed in this District Court?    (Yes or No)    __No__
   If yes:
   Judge: _____    Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?    (Yes or No)    __No__
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____    District of _____

   Is this a potential death penalty case? (Yes or No)    __No__

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?    _____ Yes    __X__ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    _____ Yes    __X__ No

_____
A. BRENDAN STEWART
TRIAL ATTORNEY, U.S. DEPARTMENT OF JUSTICE
FL Special Bar No. A5501801

*Penalty Sheet(s) attached

REV 4/8/08

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **HENRY LORA**

**Case No**:

Count #: 1

Conspiracy to Commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty**:     Twenty (20) years' imprisonment

Count #: 2

Conspiracy to Defraud the United States and Receive Health Care Kickbacks and Make False
Statements Relating to Health Care Matters

Title 18, United States Code, Section 371

**\*Max. Penalty**:     Five (5) years' imprisonment

Count #:

**\*Max. Penalty**:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**